**BRIDGEPORT GUARDIANS, INC., et al.,**
Plaintiffs-Appellees,

v.

**MEMBERS OF the BRIDGEPORT CIVIL
SERVICE COMMISSION et al.,**
Defendants-Appellants.

No. 894, Docket 73–1356.

United States Court of Appeals,
Second Circuit.

Argued May 11, 1973.

Decided June 28, 1973.

**1334**

J. Daniel Sagarin, Bridgeport, Conn. and James F. Stapleton, City Atty., Bridgeport, Conn. (Nancy A. O'Connell, Bridgeport, Conn., of counsel), for defendants-appellants.

Ira Horowitz and Michael P. Koskoff, Bridgeport, Conn. (Mark F. Gross, Bridgeport, Conn., of counsel), for plaintiffs-appellees.

Before SMITH, MULLIGAN and TIMBERS, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the District of Connecticut dated February 7, 1973 which followed a Memorandum of Decision filed on January 29, 1973, Hon. Jon O. Newman, United States District Court Judge (354 F.Supp. 778).

The action here was commenced on February 24, 1972 by the Bridgeport Guardians, Inc., a non-profit corporation whose members include nearly all the Black policemen of Bridgeport; by the Housing Police Benevolent Association, composed of special policemen who patrol public housing projects in Bridgeport and by individual Black and Puerto Rican residents who have taken but failed the patrolmen's examinations as well as several Black policemen who have failed promotion examinations. The named defendants are the members and the director of the Bridgeport Civil Service Commission and the superintendent of the Bridgeport Police Department. Intervening defendants are Bridgeport police officers who are or may be eligible for promotion as well as those who have high standing on current eligibility lists, and presumably would be appointed to the force but for the decision below. The complaint in essence charged that the merit system examinations for initial appointments and promotions within the Police Department of the City of Bridgeport discriminated against Black and Spanish residents on the basis of race, color and/or national origin. Injunctive and declaratory judgment relief were sought under the Civil Rights Acts, 42 U.S.C. §§ 1981, 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. The action was filed before the 1972 amendment to Title VII of the Civil Rights Act of 1964 which deleted the exemption of states and political subdivisions as employers within the Act.[1]

---

1. Equal Employment Opportunity Act of 1972, Pub.L.No. 92–261, § 2(1)–(2), 86 Stat. 103 (March 24, 1972), amending 42 U.S.C. § 2000e(a)–(b) (1970). It is apparent from the legislative history of the Act that Congress, by extending coverage to state and municipal employees, did not intend to divest federal courts of jurisdiction in cases under 42 U.S.C. § 1983 pending at the time of the enactment. See H.R.Rep.No.92–238, 92d Cong., 2d Sess., in 1972 U.S.Code Cong. & Admin.News p. 2137, 2154.

## I

An applicant for the Bridgeport Police Department must meet age and physical requirements, possess emotional stability, have good moral character and an aptitude for increasing his knowledge of crime detection and law enforcement techniques. He must take a written exam with a passing grade of 75 on a scale of 0 to 100. The grade is established in the rules of the Civil Service Commission and applies to all Civil Service tests given in the City. The applicant's prior training and experience is rated according to a chart assigning arithmetical values for experience and higher education. A background investigation is conducted for all who pass the written exam and the physical requirements. The director of Civil Service reviews the background investigation and in his discretion determines whether the applicant is suitable. A numerical rating is then assigned by weighting the exam grade at 70% and training and experience at 30%. The eligibility list ranks the successful applicants in · accordance with this weighted average and the list is valid for two years.[2]

The claim of the plaintiffs is that their constitutional rights to Equal Protection under the Fourteenth Amendment have been violated primarily because the written examination denies them equal employment opportunity. The court below found that the plaintiffs had made a *prima facie* showing of discrimination and the evidence amply supports the finding. Between 1965 and 1970 some 644 persons took the policeman's written examination. 58% of the 568 White candidates passed while only 17% of the 76 Black and Puerto Rican applicants were successful. Thus the passing rate for Whites was 3½ times better than Blacks and Puerto Ricans. This is a greater disparity than that existing in comparable cases where courts have found that a case of *prima facie* discrimination was established.[3] Moreover, while Bridgeport has a combined Black and Spanish speaking population of 25%, members of these minorities only represent 3.6% of the Department.[4] It is further significant that the cities of Hartford and New Haven, Connecticut, which have roughly the same population and the same size police depart-

2. See Civil Service Provisions of the Bridgeport City Charter § 9. To maintain the status quo, the district court by an order dated Oct. 19, 1972, tolled the two-year validity period of the eligibility list effective on March 6, 1972, the date of a consent order prohibiting· the filling of vacancies pending the district court's decision on the merits.

3. See, e. g., Castro v. Beecher, 459 F.2d 725, 729 (1st Cir. 1972) (Passing rates were 25% for Blacks, 10% for Spanish-surnamed individuals, and 65% for all others) ; Chance v. Board of Examiners, 458 F.2d 1167, 1171 (2d Cir. 1972) (Whites passed at 1½ times the rate for Blacks and Puerto Rican candidates) ; Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1089–1090, (E.D.Pa.1972), modified 473 F.2d 1029 (3d Cir. 1973) (en banc) (Whites passed at 1.82 times the rate for Blacks). See also Vulcan Society v. Civil Serv. Comm'n, 360 F.Supp. 1265, 1268–1270 (S.D.N.Y.1973).

4. While a mere discrepancy between a minority community population and employment population may not of itself be sufficient to establish a *prima facie* case of discrimination (see Logan v. General Fireproofing Co., 3 F.E.P. Cases 854, 856 (4th Cir. 1971) ; Harper v. Mayor & City Council, 5 F.E.P. Cases 1050, 1052–53 & n. 5 (D.Md.1973) ; Chance v. Board of Examiners, 330 F.Supp. 203, 214 (S.D. N.Y.1971), aff'd, 458 F.2d 1167 (2d Cir. 1972)), it does invite inquiry (see Castro v. Beecher, 334 F.Supp. 930, 935–936 (D.Mass.1971), modified, 459 F.2d 725 (1st Cir. 1972)). In some cases, courts have even found a substantial discrepancy sufficient to establish a *prima facie* case. E. g., Carter v. Gallagher, 452 F.2d 315, 323 (8th Cir. 1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) ; Western Addition Community Organization v. Alioto, 330 F.Supp. 536, 539 (N.D.Cal.1971).

ments, show a decidedly better record of minority police employment.[5]

Appellants cannot dispute seriously that a *de facto* case of discrimination has been here established. Moreover, they do urge that it is not of constitutional magnitude and even if it were, the court below erred in not applying the customary "rational relationship" test of the Fourteenth Amendment. Indeed, Judge Newman found that the written examination under attack did test intelligence and hence he concluded it was not irrational to employ it for police candidates. 354 F.Supp. at 791. Appellants relying principally upon San Antonio Independent School Dist. v. Rodriguez 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (March 21, 1973), urge that case as authority for the proposition that the defendants here are only required to establish a rational basis for the test and since Judge Newman found this to exist, the judgment below must be reversed. *Rodriguez*, however, is not controlling here. In that case, the Court dealt with the Texas property tax plan for financing educational facilities. It was urged that scheme was subject to the more rigorous compelling government interest test because it created a suspect wealth classification. The Court rejected the argument since the plaintiffs had failed to establish that the plan operated to the peculiar disadvantage of any class fairly definable as indigent, i. e., poor persons do not necessarily live in poor school districts, 411 U.S. at 22–23,

93 S.Ct. at 1291. Here however, the plaintiffs have been found to constitute a class which has been disadvantaged by the employment of the test. Therefore, we do not consider *Rodriguez* in point.

Having established the discrimination we cannot agree that since there was no showing that the test was deliberately or intentionally discriminatory, the defendants have therefore escaped the burden of establishing justification for its utilization. Chance v. Board of Examiners, 458 F.2d 1167, 1177 (2d Cir. 1972); see Pride v. Community School Bd., 482 F.2d 257, 265 (2d Cir. 1973); Kennedy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108, 114 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S. Ct. 1256, 28 L.Ed.2d 546 (1971). The question then becomes what is the appropriate burden of justification thrust upon the defendants. This court has thus far avoided the problem since in *Chance* we found that in any event the examination in question did not even comply with the less rigorous standard of "rational basis." Judge Feinberg who wrote the opinion in *Chance*, has since observed (Green v. Waterford Bd. of Educ., 473 F.2d 629, 633–634 (2d Cir. 1973)) that the rational basis test has become perceptibly more rigorous as the result of the unanimous opinion of the Supreme Court in Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). Judge Newman held that the appropriate test was somewhere between the tra-

5.

| | Bridgeport | Hartford | New Haven |
|---|---|---|---|
| Total population | 156,542 | 158,017 | 137,707 |
| Blacks | 25,476(16%) | 44,540(28%) | 36,175(26%) |
| Spanish speaking | 14,103(9%) | 11,942(8%) | 4,916(4%) |
| Combined Black and Spanish speaking | 39,579(25%) | 56,482(36%) | 41,091(30%) |
| Total police department | 469 | 483 | 434 |
| Black and Puerto Rican policemen | 17(3.6%) | 66(14%) | 57(13%) |
| Personnel in police department above the rank of patrolman | 117 | 139 | 126 |
| Blacks and Puerto Ricans in police ranks above patrolman | 1(1%) | 22(16%) | 13(10%) |

ditional rational basis and compelling necessity criteria the courts have employed in Equal Protection cases. 354 F.Supp. at 788 & n. 6.

■ The public employment test cases are *sui generis* in that the classification is not made by the municipal body but results from a testing device which in fact results in an invidious discrimination since it disadvantages minority groups. Hence, while the right to public employment is not fundamental in an Equal Protection context (see San Antonio Independent School Dist. v. Rodriguez, *supra*, 411 U.S. at 29–34, 93 S.Ct. at 1295–1297) there is a suspect (racial) classification which ensues. There have been so many of these cases in litigation that a viable test has emerged which in fact was adopted by the court below and has wide judicial support. Where the plaintiffs have established that the disparity between the hiring of Whites and minorities is of sufficient magnitude, then there is a heavy burden on the defendant to establish that the examination creating the discrimination bears a demonstrable relationship to successful performance of the jobs for which they were used. This essentially was the test employed by this court in *Chance* and by the First Circuit in Castro v. Beecher, 459 F.2d 725 (1972). This "job relatedness" test was recently employed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824 n. 14, 36 L.Ed.2d 668 (May 14, 1973). While *McDonnell* was a Title VII case and did not technically involve Equal Protection issues, it is significant that the court relied not only on Griggs

v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849, 28 L.Ed.2d 158 (1971) but also cited both *Castro* and *Chance* which were Section 1983 cases as is the case before us.[6] In view of the substantial authority for this test we see no advantage in an agonizing semantic discussion as to whether it is within or without the parameters of the "rational basis" test employed in distinguishable situations.

■ We therefore turn to the question of whether the defendants have established that the written examination under attack was "job related." Did it bear a demonstrable relationship to successful performance of the patrolman's job? Judge Newman meticulously reviewed the evidence and concluded that the defendants had failed to sustain their burden. We cannot characterize this to be a clearly erroneous finding.

The best method of establishing job relatedness is to establish that the test had "predictive validity." Criteria must be identified which indicate successful job performance. Test scores are then matched with job performance ratings for the selected criteria. This establishes realistically whether the applicant who received high scores was actually performing as predicted. No validation studies have been conducted here either before the exams were given or later. Two other recognized methods of insuring that examinations are job related are based upon so called "construct validity" and "content validity." Construct validity would be achieved if there had been an identification of the characteristics believed important to successful job performance followed by

6. Judge Weinfeld has recently recognized that "courts confronted with challenges to public employment examinations predicated upon the equal protection clause of the Fourteenth Amendment have generally agreed that the Guidelines issued by the EEOC provide persuasive standards for evaluating claims of job-relatedness. *See*, *e. g.*, Castro v. Beecher, 459 F.2d 725, 729 (1st Cir. 1972) ; Carter v. Gallagher, 452 F.2d 315, 320, 326, adopted in relevant part, 452 F.2d 327 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) ; Fowler v. Schwarzwalder, 351 F.Supp. 721 (D.Minn.1972) ; Pennsylvania v. O'Neill, 348 F.Supp. 1084 (E.D.Pa.1972), aff'd in relevant part by an equally divided court, 473 F.2d 1029 (3d Cir. 1973) (en banc) ; Western Addition Community Organization v. Alioto, 340 F.Supp. 1351 (N.D.Cal.1972) ; *cf.* Chance v. Board of Examiners, 458 F.2d 1167, 1176–1177 (2d Cir. 1972)." Vulcan Society v. Civil Serv. Comm'n, 360 F. Supp. 1265, 1273 n. 23 (S.D.N.Y.1973).

the structuring of an examination directed to a determination of the degree to which the applicant possessed the required characteristics. Content validity would be established if the content of the test closely duplicates the actual duties to be performed by the applicant. While it is concededly difficult to prepare examinations which can accurately calibrate and measure the ability of a person to perform the duties of a policeman which combines not only professional skills but decisions involving judgment and tact and qualities of personal courage, compassion, dedication and moral probity, we are persuaded that the challenged examination was primarily based upon verbal skills and was not significantly job related.

The examination used was not prepared by the defendants but was purchased from the Public Personnel Association (PPA), a private non-profit corporation. It was prepared in 1953 and is utilized by several hundred governmental agencies. It is basically an intelligence test not geared in any significant fashion to establish whether or not the applicant will be a good policeman. Thus many of the vocabulary and arithmetic questions are only superficially or peripherally related to police activity. For example:

> "69. Cartridges cost retail $3.00 for boxes of 20. The wholesale cost is $2.25 a box plus $.25 a hundred shipping charge. How much is saved if 300 are purchased wholesale?"

While policemen do use cartridges, the question has in fact nothing specifically to do with the work of the police. If the word "Bible" were substituted for "cartridge," the answer would be the same but it would hardly be probative of

an applicant's fitness for the ministry or even as a Bible salesman. The question selected is not atypical.[7] Aside from irrelevancy the examination's stress on vocabulary and verbal skills produces a cultural bias according to the testimony of Richard Barrett, a recognized expert in testing. Moreover, that part of the test which does seem relevant, the ability to observe and remember faces and data, consists of displaying eight sets of front and profile mug shots, but all of the faces are of Whites. Barrett testified that it was probably easier for Whites to distinguish among White faces than for Blacks. There is some support for this view.[8] The entrance examination is further vulnerable in that the City ordinance mandates a uniform cut-off score of 75. This is an arbitrary determination indicative of an archaic testing system particularly where there is no evidence of weighting of questions based upon actual job requirements.

 While the patrolman's entrance examination is clearly flawed and its viability as a vehicle of determining fitness for the prospective patrolman is not established, the promotional procedure also under constitutional attack is on a different footing. Again the assault is upon the written examination. The difficulty is that only 20 non-Whites have taken the sergeant's examination since 1960. The 1972 examination had 201 candidates, 10 of which were Blacks or Puerto Ricans—the passing rate for the Whites was 68%, for the minorities 40%. As Judge Newman pointed out if only one more non-White had passed the examination the comparative passing rates would be 68% and 50%. There was no showing therefore of the sub-

---

7. Thus the references in the examination questions to jail food bill (26), cartridges (27 & 33), burglar (41), patrol car (47, 81 & 105), arrests (48), police whistles (57), police clerks (58), disturbances of the peace (82), patrolmen and sergeants (106), and robberies (117) have no real relationship to the proper answer which is based on arithmetical computation and

has no relevance to the policeman's job responsibilities.

8. See United States v. Brown, 461 F.2d 134, 145 n. 1 (D.C.Cir.1972) (Bazelon, C. J., dissenting). But see United States v. Telfaire, 469 F.2d 552, 561–562 (D.C. Cir.1972) (Leventhal, concurring).

stantial *de facto* discrimination in the promotion examination, which was apparent in the hiring exam. While it is true that there are no non-White supervisory personnel in the Bridgeport Police Department and only one non-White above the rank of patrolman, the apparent cause is the discriminatory hiring examination and not subsequent examining procedures. Not having found *de facto* discrimination, the court did not adjudicate the "job relatedness" character of the promotion procedures. We again find no abuse of discretion and cannot accept appellees' position that the discrepancy between the non-White supervisory police personnel in comparison to the non-White City population, is sufficient to shift the burden of justification of the written tests to the defendants. See note 4, *supra*.

## II

After making these findings, the court below entered the following judgment:

It is ORDERED, ADJUDGED and DECREED that the patrolman's examination as used by the defendants now has and for many years has had the effect of denying plaintiffs their constitutional right to the equal protection of the laws.

It is further ORDERED, ADJUDGED and DECREED that:

1. Defendants and their employees are enjoined from using patrolman's examinations of the type found discriminatory in this suit in the manner such examinations have been used. Until the remaining provisions of this decree have been complied with, any written examination for the rank of patrolman which the defendants propose to use together with the use to be made of its results shall, prior to use, be submitted to the court for review and approval together with satisfactory evidence that the proposed examination is job related and not discriminatory in the manner in which it will be used.

2. In making appointments to the rank of patrolman and promotions to the ranks of detective, sergeant, lieutenant, and captain, defendants shall assemble a pool of Black and Puerto Rican candidates qualified for the position (hereinafter referred to as "minority pool") and shall make appointments and promotions from such pool to the number of current and future vacancies specified in the following provisions:

(a)(1). Half of the current ten vacancies in the rank of patrolman.

(2). Three-fourths of the next 20 vacancies in the rank of patrolman whether caused by the creation of new positions or otherwise.

(3). Half of all vacancies in the rank of patrolman occurring thereafter until the number of Black and Puerto Rican patrolmen is 50.

(b). Half of all current and future vacancies in the rank of detective until the number of Black and Puerto Rican detectives is 6.

(c). Half of all current and future vacancies in the rank of sergeant until the number of Black and Puerto Rican sergeants is 6.

(d). Half of all vacancies occurring after January 1, 1974 in the rank of lieutenant until the number of Black and Puerto Rican lieutenants is 3.

(e). Half of all vacancies occurring after January 1, 1975 in the rank of captain until the number of Black and Puerto Rican captains is 2.

(f). In filling current and future vacancies pursuant to the provisions of 2(a)(3)–(e), the initial vacancy and every odd-numbered vacancy thereafter shall be filled from the minority pool. In filling future vacancies pursuant to the provision of 2(a)(2), if the 20 vacancies specified therein are not created simultaneously, the first 15 vacancies shall be filled from the minority pool.

(g). Variation from the formulas set forth in 2(a)–(e) will be permitted only upon court order obtained upon a showing of (a) unavailability of qualified Black and Puerto Rican candidates, or (b) other good cause.

(h). Blacks and Puerto Ricans appointed to the rank of patrolman or promoted to higher ranks under normal personnel procedures shall not be considered as appointments or promotions from the minority pool for purposes of the provisions of 2(a)–(e) but shall be counted for purposes of meeting the target totals for Blacks and Puerto Ricans set forth in these provisions.

3. Criteria and procedures to be used in determining qualifications for the minority pool and plans for recruiting qualified candidates for the minority pool shall be submitted to the court for review and approval before being used. Exemption from state and local restrictions will be approved where necessary to effectuate this decree.

4. This court's order of October 19, 1972, tolling as of March 6, 1972, the period of validity of existing eligibility lists for the rank of patrolman and detective, is modified to provide that such lists are valid for use in filling positions that became vacant within two years of the effective dates of such lists. The stay entered on March 6, 1972, is terminated.

Jurisdiction will be retained for the implementation of the decree.

■ The principal attack of the appellants here is upon the remedy devised by the court to enforce the constitutional guarantees of the Equal Protection Clause. We commence with the basic tenet that the district court, sitting as a court of equity, has wide power and discretion to fashion its decree not only to prohibit present discrimination but to eradicate the effects of past discriminatory practices. Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 517, 13 L.Ed.2d 709 (1965); United States v.

Wood, Wire & Metal Lathers, Local 46, 471 F.2d 408, 413 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L. Ed.2d 398 (1973). Although most of the cases dealing with the issue of past discriminatory practices arose under Title VII of the Civil Rights Act of 1964, Section 1983 cases have also granted relief by sanctioning quotas aimed at curing past discrimination See, e.g., Pennsylvania v. O'Neill, 473 F.2d 1029 (3d Cir. 1973) (en banc); Castro v. Beecher, *supra*, 459 F.2d 725; Carter v. Gallagher, 452 F.2d 315, 327–332 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).

■ We agree of course that hiring quotas are discriminatory since they deliberately favor minority groups on the basis of color. This court however has previously sanctioned hiring quotas to cure past discrimination. United States v. Wood, Wire & Metal Lathers, Local 46, *supra*, 471 F.2d 408. While we approve such relief somewhat gingerly, we do not believe that Judge Newman abused his discretion in imposing the quotas on hiring here. Although there was no showing of intentional discrimination, it is also a fact that the defendants were employing an archaic test which was not validated and which, as we have found, was not job related. Attacks by Blacks and other minorities upon examinations emphasizing verbal skills and not testing the professional skills of the vocation applied for, have been under increasing attack, and the failure here of the defendants to recognize the increasing evidence that tests of this type have an innate cultural bias, cannot be overlooked. A second factor to be weighed is that with the exception of a single abortive effort in 1968, the City of Bridgeport and its Police Department have failed to take positive steps to recruit minority personnel. Greater numbers could surely be attracted if realistic efforts were made in the minority neighborhoods and in the media they patronize, to educate minority youth to the advantages and opportunities of a police career. Thirdly, the

judgment appealed from insists upon the defendants developing a meaningful test which will produce qualified Blacks and Puerto Ricans and not merely token personnel selected because of race and not qualification. Moreover, the 15% goal set in the judgment is modest; it is below the 25% minority population and only slightly more than the existing representation of 14% and 13% in the Hartford and New Haven police forces. Finally, but perhaps the most crucial consideration in our view is that this is not a private employer and not simply an exercise in providing minorities with equal opportunity employment. This is a police department and the visibility of the Black patrolman in the community is a decided advantage for all segments of the public at a time when racial divisiveness is plaguing law enforcement.

We are constrained however to find that the imposition of quotas above the rank of patrolman constitutes an abuse of discretion and is clearly erroneous. Initially, we observe that there has been no finding that the promotion examination is not job related. While past exclusionary hiring examinations do justify the quota remedy on entrance, there is no justification in our view for extending the remedy to higher ranks. We are discussing some 117 positions with time-in-grade requirements mandating three years' service as patrolman, sergeant and lieutenant postponing promotion to captain for a minimum of nine years. While this factor will delay those of the minority groups who will become patrolmen, the imposition of quotas will obviously discriminate against those Whites who have embarked upon a police career with the expectation of advancement only to be now thwarted because of their color alone. The impact of the quota upon these men would be harsh and can only exacerbate rather than diminish racial attitudes. See Vulcan Society v. Civil Serv.

Comm'n, 360 F.Supp. 1265, 1277–1278 (S.D.N.Y.1973); Kaplan, Equal Justice in an Unequal World: Equality for the Negro—The Problem of Special Treatment, 61 Nw.U.L.Rev. 363, 375–80 (1966). Police morale is again a proper concern if the welfare of the whole community is to be considered. We see no purpose in curing a past mischief by imposing a new one which is deliberately tainted. We would strike from the judgment below therefore all quota requirements above the rank of patrolman. The district court has retained jurisdiction here to supervise the minority hiring and promotion procedures of the Department. In view of the careful attention and study which the court below has given to the question of eliminating the effects of the prior hiring discrimination, we remand to the court for consideration of other possible solutions which may be feasible and which will not create the inequities inherent in the imposition of quotas at higher levels. Two possible approaches are suggested. At the present time each police officer must spend three years in grade before becoming eligible for the next level. Thus a minimum of nine years must elapse before a patrolman can become a captain. While time-in-grade criteria have an obvious job relatedness, it may be that the time lapse at least for higher grades, may be shortened to some extent consistent with police efficiency. Similarly, seniority is given a weighting of 10% on promotion procedure. It may be that this factor can be either eliminated or its weight decreased. The record before us does not permit this court to make these decisions and we prefer to leave to the court below this determination providing that any feasible amendment apply to all candidates for promotion irrespective of race or ethnic background.

Affirmed in part, reversed in part and remanded.