The **FIREBIRD SOCIETY OF NEW HAVEN, INC., et al., Plaintiffs,**

v.

The **NEW HAVEN BOARD OF FIRE COMMISSIONERS et al.**

**Civ. No. 15876.**

United States District Court, D. Connecticut.

Feb. 3, 1975.

Michael P. Koskoff, Brideport, Conn., David N. Rosen, New Haven, Conn., for plaintiffs.

Roger J. Frechette, Corp. Counsel, Frank S. Meadow, Asst. Corp. Counsel, New Haven, Conn., for defendants.

W. Paul Flynn, New Haven, Conn., for intervenors.

J. Daniel Sagarin, Bridgeport, Conn., for applicants for intervention.

### RULING ON MOTION TO INTERVENE

ZAMPANO, District Judge.

On August 30, 1974, this Court approved and issued a decree which for all practical purposes had the effect of settling before trial the instant lawsuit. All the parties to the action "acquiesced in" and agreed not to appeal the Court's order "in order to end this litigation." Subsequently, on September 20, 1974, the Applicants for Intervention filed motions which seek:

(a) to intervene as a matter of right under Rule 24(a), F.R.Civ.P.; or

(b) permission to intervene under Rule 24(b), F.R.Civ.P.;

(c) to reopen the judgment and vacate the August 30th Order of this Court;

(d) to participate in this litigation, presumably after judgment is reopened, by raising certain defenses and cross-claims to the action; and

(e) to appeal the Order of August 30th to the Court of Appeals for the Second Circuit.

## I

On October 5, 1973, this Civil Rights Act suit for declaratory and injunctive relief as well as damages was commenced to challenge the constitutionality of the hiring and promotional procedures with respect to minority groups in the New Haven Department of Fire Services ("Department"). The plaintiffs were the Firebird Society of New Haven, Inc. ("Firebirds"), an organization composed of all the black firemen in the Department, several members of that organization, and certain past and prospective minority applicants to the Department. The defendants included the New Haven Board of Fire Commissioners, the Civil Service Commission of the City of New Haven, the Fire Department and its Chief, and the City of New Haven and its Mayor. Upon motion, 17 white captains in the Department who had been appointed but not assigned to duty were permitted to intervene as defendants. Jurisdiction was premised on 28 U.S.C. § 1343(3) and 42 U.S.C. § 2000e-5(f).

The complaint, filed after the plaintiffs exhausted their administrative remedies with the Equal Employment Opportunity Commission and received a "right to sue" letter from the United States Department of Justice, see 42 U.S.C. § 2000e-5(f), levelled a broad attack on almost all aspects of the hiring and promotional practices of the Department on the ground of discrimination based on race and national origin. The selection of firemen was alleged to have a racially disproportionate impact because the written examinations were not subject to an impartial professional validity study, were not job-related, and were improperly prepared, evaluated and graded. In addition, it was claimed that discrimination was enhanced by the Department's minimum requirements regarding age, education, height, weight, and prior arrests.

The plaintiffs further contended that there was a policy of discriminating against black firemen in promotional practices. As with the entry procedures, the plaintiffs focused on the written exam, particularly the testing methods utilized for the rank of lieutenant. They also condemned the "time in grade" requirement for promotion and the so-called "efficiency rating" both of which, it was asserted, were merely devices to discriminate against black firemen.

Extensive relief was requested which included, in addition to damages and back pay, the following:

(a) A revised system for promotions under which qualified applicants are to be selected only from the class of plaintiffs, as openings arise, until they are represented as officers in the Department in proportion to their number among residents of the City of New Haven; or

(b) A revised system for promotions under which qualified applicants are to be promoted alternately, one white and one minority from the class of plaintiffs, as openings arise, until they are represented as officers in the New Haven Fire Department in proportion to their number among residents of the City of New Haven; and

(c) A revised system of hiring under which qualified applicants will only be hired from the class of plaintiffs, as openings arise, until they are represented in the Department in proportion to their number among residents of New Haven; or

(d) A complete plan for promotions, recruitment and hiring which includes as part of any proportional hiring plan that such plan shall apply to all hiring done after filing of plaintiffs' complaint with the EEOC;

(e) The granting of seniority to plaintiffs and members of their class back to the date that they first applied for a position in the New Haven Fire Department regardless of whether or not they passed the hiring selection criteria which have been determined to have been discriminatory.

**460**

## II

When this action was commenced, the plaintiffs moved for immediate injunctive relief, claiming that on the basis of statistics alone, they could demonstrate a prima facie case of discrimination. Cf. Morrow v. Crisler, 479 F.2d 960 (5 Cir. 1973) (en banc); Carter v. Gallagher, 452 F.2d 315 (8 Cir. 1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed. 338 (1972).

Among other things, the plaintiffs pointed out that the minority population of New Haven was 30 percent, and that none of the 502 men employed by the Department was Hispanic and 18, or less than 4 percent, were black. There was one black lieutenant out of 61, no black captain out of 34, and no black officer in any higher command position. Thus, of the 107 officers in the Department only one was black, and he held the lowest rank above private.

The plaintiffs further expressed confidence that at an evidentiary hearing they could prove a pattern of willful discrimination against minorities in the Department that extended over a period of many years. Serious claims and examples of intentional discrimination were alleged, supported in part by affidavits. In addition, the plaintiffs maintained that the defendants were attempting to block effective judicial redress by recently appointing 17 white captains from the eligible list just prior to the expiration of that list, and by selecting 18 new trainees (only one of whom was black) from a "substitute list" then in existence. Thus, if the plaintiffs prevailed in their lawsuit, they calculated that the relief they sought would have no practical effect for from one to eight years.

Counsel for the defendants, on the other hand, denied each of the plaintiffs' material allegations. However, with commendable candor, they admitted that the present hiring and promotional methods did have certain "deficiencies" which needed correction. They stressed that the entire matter was under review, and that experts had been retained by the City to design new exams which would meet all legal requirements. In order to avoid a costly, lengthy, and probably divisive lawsuit, they requested that this Court provide guidance to the parties so that their differences might be resolved.

Thereupon, it was agreed as follows:

1. That temporary injunctive relief would issue restraining the defendants from assigning, hiring or promoting anyone not in the plaintiffs' class, and from administering any written exams in conjunction with promotions within the Department;

2. That the 17 newly appointed white captains and the new trainees would not be assigned to duty;

3. That, in order to disseminate notice of the lawsuit and of the right of interested persons to intervene in the action, copies of the Court's order and a list of all the plaintiffs' claims for relief would be posted in each of the City's firehouses, together with a covering notice advising all firemen of the lawsuit and suggesting that all interested firemen "wishing to intervene in this lawsuit are entitled to intervene and should seek counsel immediately to be present at a pre-trial hearing in the District Court at 2 P.M., Monday, October 15, 1973;"

4. That all discovery procedures and evidentiary hearings would be indefinitely postponed until every avenue of settlement was exhausted; and

5. That the plaintiffs would prepare a list of the issues and recommendations for settlement to serve as a guide for future conferences.

## III

The next conference was held on October 15, 1973. In addition to counsel of record, Attorney W. Paul Flynn appeared and stated that although he was counsel for the New Haven Fire Fighters Local No. 825 ("Union"), he was

not formally entering an appearance for the Union. However, he did wish to file a motion to intervene in behalf of the 17 white captains whose assignment to duty was enjoined by this Court's order of October 5, 1973. The motion to intervene was orally granted and thereafter Attorney Flynn played an active role in the negotiations.

The basic issues were defined by the plaintiffs as follows:

1. What amount of compensatory and punitive damages should the defendants pay as a result of past discrimination?

2. In the light of past discrimination, what concessions would the defendants make with respect to the "time in grade" restrictions for promotions?

3. What steps toward recruitment would the defendants undertake to increase the number of minorities in the Department?

4. When and how could the defendants devise new entrance and promotional exams to conform to the requirement of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e?

5. What means would be employed to achieve substantial minority representation in the Department?

6. What method should be utilized to increase minority representation in the ranks of lieutenant and captain?

7. What attorney's fees should be awarded to plaintiffs' counsel?

### IV

Ten months later, due to the extraordinary efforts of counsel and the cooperation of their respective clients, all the aforementioned issues were finally resolved without trial when this Court issued its decree of August 30, 1974.

However desirable, it is an impossible task to recollect and recount herein each and every material factor which culminated in the entry of the final order. The several court hearings and the numerous orders filed by this Court are of course a matter of record. In addition, however, there were 23 chambers conferences, some of which extended long into the evening. These meetings were held with the knowledge and approval of all counsel of record and included, at one time or another: the attorneys for the parties and intervening defendants, high ranking officials of the City, officers of the Union, individuals named as defendants including the Chairman and several members of the Board of Fire Commissioners, certain white firemen who were not named as parties, the Chief of the Department, and others.

In order to encourage and maintain the free, open and candid exchange of ideas, these meetings were regarded by all in attendance to be "off the record" discussions. Despite this, the news media, due to the inevitable "leaks," widely reported the scheduling of these conferences and many of the doings therein. Moreover, counsel were required to make progress reports to their clients and to obtain their consent to the innumerable preliminary agreements which formed the basis for the final decree. Since so many persons were necessarily involved in the negotiations which led to a final settlement, it is difficult to assume that the nature and content of the chambers meetings were secret. In fact, on occasions, counsel informed the Court that at union meetings or while they visited firehouses throughout the City, they were "grilled" on the latest developments and felt obliged to respond.

From the outset it was evident that amicable resolution of the issues required many concessions by the plaintiffs. After the first round of negotiations, the plaintiffs agreed to drop their demand for back pay and for exemplary and actual damages. However, the plaintiffs insisted that minorities occupy 25 percent of the privates' rank, 15 percent of the lieutenants' rank, 15 percent of the captains' rank, 10 percent of the Battalion Chiefs' rank, and 15 percent of "other supervisory"

positions within a period of four years. In addition, the plaintiffs refused to agree to modify the existing orders which restrained the defendants from filling existing vacancies in the Department. It appeared clear to the Court that the defendants would not accede to these demands without substantial modifications, particularly with respect to positions above the rank of private.

Nevertheless, significant progress toward the resolution of most of the issues in the case was made when, after a series of meetings, the parties acquiesced in this Court's Order of December 5, 1973. First, a detailed plan for the recruitment of minorities into the Department was established. Second, the Department was ordered to develop entrance and promotional tests as soon as possible which meet the requirements of 42 U.S.C. § 2000e et seq. Third, in order to achieve substantial minority representation in the Department, while not displacing any men already employed, the Department was required to hire at least 16 of the next 24 firefighters from among qualified minority group applicants and, thereafter, to hire at least one minority applicant for every non-minority applicant until the total number of minority privates reaches 75. Fourth, since seven vacancies existed at the rank of captain, the Court modified its injunction to permit seven white firemen (who had been appointed but not assigned) to fill these positions. Fifth, the Court permitted the 18 probationary firemen (who had been sworn into office but not assigned) to be assigned to regular duty. Sixth, the "time in grade" requirement was modified to provide that any private may take the lieutenant's examination 30 months after his appointment and "other officers" may take the examination for the next higher rank after 12 months at the rank below the one for which the examination is given. Seventh, the defendants promised to exercise "good faith" to insure that minorities would have representation in the ranks of lieutenant and captain. Finally, the Order incorporated the agreement of the parties that the plaintiffs would waive their claims for damages but not attorneys' fees.

The major question remaining at this time concerned the amount of "good faith" on promotions that the defendants had to demonstrate before the suit would be settled. After much negotiation, the plaintiffs agreed not to prosecute the action if seven qualified blacks were selected out of the next 21 lieutenants to be appointed within a two-year period and if, in addition, one qualified black captain was assigned within a reasonable time thereafter. At this Court's request, an "in camera" agreement was drafted which merely placed in writing the plaintiffs' unilateral "promise" not to proceed with the lawsuit in the event seven minority lieutenants and one minority captain were appointed as a result of the next lieutenants' and captains' examinations. It is important to point out that the examinations in mind were the new tests mandated by this Court's Order of December 5, 1973. It was anticipated that the defendants' experts would prepare these validated examinations prior to February 15, 1974.

Soon thereafter, however, the defendants reported they would be unable to develop validated exams for some time to come. They suggested that the testing for lieutenants proceed as scheduled with the understanding that the results thereof not be disclosed or acted upon until the plaintiffs were afforded the opportunity to renew the suit and address appropriate motions to the Court in the event seven minorities were not within the first 21 eligible for promotion. The plaintiffs agreed and the Court's Order of December 5, 1973 was amended.

Another problem arose when, in violation of this Court's injunction, the Board of Fire Commissioners promoted two white firemen to the rank of lieu-

tenant. The matter was eventually resolved after a series of conferences which included counsel, the members of the Board of Fire Commissioners, officials of the Union, the two promoted firemen, and the Court. The two men were permitted to take their assignments as lieutenants with the reservation that the promotions were open to challenge if plaintiffs should activate the lawsuit in the future.

The lieutenants' examination proceeded on schedule and on May 22, 1974, the defendants presented the results to the Court and the plaintiffs. While seven blacks were demonstrated to be qualified, none appeared in the top 21 rankings. The plaintiffs reiterated their original contentions that the test had a substantial discriminatory impact on minorities and exercised their right to activate the lawsuit. As a result, the injunction covering promotion to the rank of lieutenant was continued, a discovery schedule was agreed upon, and a trial date was set by the Court for September 15, 1974.

While discovery procedures were underway, counsel for the defendants and the intervenors urged the Court on several occasions to reopen settlement negotiations. The Court did so. While perhaps no specific representation was made, the Court is satisfied that it was induced to resume negotiations because high level officials of the City and Union, as well as the party defendants, firmly believed trial should be avoided if any avenue for settlement remained open.

Intensive negotiations commenced again. The main obstacle to a settlement was removed when the plaintiffs agreed to have seven qualified black firemen on the lieutenants' eligibility list "slotted into positions" which would insure their appointments within the two-year period before the list expired by law. Based on their knowledge and experience, the defendants were reasonably certain that not more than 21 lieutenants would be assigned within the specified period. When the Court expressed the desire that the seven "displaced" white firemen be protected, the parties agreed to the provision in the final decree that the eligibility list shall not expire until "at least 28 appointments shall be made thereon." Whites were placed on the list strictly in order of their combined promotional scores. The blacks were also listed in order of their scores, and their names inserted at intervals in positions 4, 7, 10, 13, 16, 19 and 22 on the eligibility list.

All the agreements arrived at by the parties after ten months of negotiations were incorporated into this Court's Order of August 30, 1974, which decree was "acquiesced in by all of the parties to the suit in order to end this litigation."

V

The Court must consider the motions filed by the Applicants for Intervention (hereinafter "applicants") in light of the background just set forth.

The applicants are the Firefighter's Committee to Preserve Civil Service, Inc., a non-profit corporation organized under Connecticut law after the entry of this Court's Order on August 30, 1974, and certain non-minority firemen within the New Haven Department of Fire Services in the ranks from private to battalion chief. The sole purpose for the formation of the corporate applicant was to intervene in this lawsuit and to set aside the Court's final decree in order to "preserve a system of promotions within and appointments to the New Haven Department of Fire Services based upon merit and not upon considerations of race." The individual applicants are three captains, two battalion chiefs, one lieutenant, a fireman not on the lieutenants' eligibility list, and nine privates, two of whom are at the top of the current eligibility list and seven of whom rank beyond the 28th position on the list.

At the outset, the Court notes its difficulty in determining what "interest" the applicants seek to protect by intervention. No one of the applicants is adversely affected by the Court's Order: the two privates at the top of the eligibility list will be assigned promptly; the other eight privates would most probably not be assigned even if the seven minorities were removed from the list; and, the remaining individuals either hold the rank of lieutenant or a higher rank. Nor do the applicants who seek to intervene possess a protectible "interest" in the assignment list into which the names of the minority firemen were inserted. The present list was compiled only as a result of the plaintiffs' consent to the lifting of the injunction and to the administration of the non-validated examination, as a starting point in a program designed to ameliorate the continuing effects of past discrimination. If the Court's Order were set aside, there is now every reason to believe that appointments and assignments to the rank of lieutenant would be enjoined until validated tests were developed and a new eligibility list drawn from the results thereof. Thus, were the applicants permitted to intervene and to reopen the Court's Order of August 30, 1974, there would necessarily be a nullification of the present eligibility list, and whatever "interest" the applicants had in this list would disappear.

Relying on the principles enunciated in Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, 482 F.2d 1333, 1342 (2 Cir. 1973), the applicants assert they are opposed to the implementation of a "quota promotional remedy" which is proscribed by various provisions in the Charter of the City of New Haven, the Civil Service Rules, and the Union's collective bargaining agreement with the Department.

■ ■ In *Bridgeport Guardians*, the Second Circuit condemned a remedial system of promotion whereby a certain ratio of promotions had to come from the minority personnel until 15 percent of the officers were minorities. The Circuit Court reasoned:

. . . the imposition of quotas will obviously discriminate against those Whites who have embarked upon a police career with the expectation of advancement only to be now thwarted because of their color alone. The impact of the quota upon these men would be harsh and can only exacerbate rather than diminish racial attitudes. 482 F.2d at 1341.

Here, however, no quota has been imposed. Rather, the terms of the settlement in the case at bar simply grant interim priority relief to qualified members of a minority who have previously been denied equal opportunity for advancement as a result of examinations which had racially disproportionate impact. The merit system remains intact for all future promotions. In the Court's opinion, this remedy is neither forbidden by the Constitution nor prohibited by Title VII of the Civil Rights Act of 1964. See e. g., Boston Chapter, N.A.A.C.P., Inc. v. Beecher, 504 F.2d 1017 (1 Cir. 1974); Rios v. Enterprise Ass'n Steamfitters Local 638, 501 F.2d 622 (2 Cir. 1974); N.A.A.C.P. v. Allen, 493 F.2d 614, 618–20 (5 Cir. 1974); cf. Morrow v. Crisler, supra; Vulcan Society v. C.S.C., 490 F.2d 387 (2 Cir. 1973). Since the applicants lack the prerequisite interest in the subject matter of this action, they may not intervene as of right pursuant to Rule 24(a), F.R. Civ.P.

■ ■ The applicants have failed in other respects to demonstrate that they have a right to intervene under Rule 24 (a) or, alternatively, that they should be permitted to intervene pursuant to Rule 24(b). Both Rules provide for intervention only upon "timely application." The present motions were neither served nor filed until three weeks after the entry of the Order terminating the case. Absent unusual and compelling

circumstances, an application to intervene is untimely if the litigation has been concluded and judgment entered. See, e. g., Allegheny Corp. v. Kirby, 344 F.2d 571, 574 (2 Cir. 1965), cert. dismissed as improvidently granted, 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966); United States v. Blue Chip Stamp Company, 272 F.Supp. 432, 435–441 (D.C.Cal.1967), aff'd sub nom. Thrifty Shoppers Scrip Co. v. United States, 389 U.S. 580, 88 S.Ct. 693, 19 L.Ed.2d 781 (1968); Slusarski v. United States Lines Co., 28 F.R.D. 388, 390 (E.D.Pa.1961). No such circumstances exist here.

It seems clear to the Court that the applicants had ample notice of the pendency of the lawsuit and the nature of the relief claimed. The three documents posted in early October, 1973, in each firehouse, which no one of the applicants denies seeing or reading, included: 1) a notice which stated that the lawsuit involved a claim of racial discrimination with respect to "promotions" and invited each interested fireman to intervene in the action; 2) a copy of the complete list of the remedies sought by the plaintiffs, with references throughout to "promotions" and "system for promotions;" and 3) a copy of this Court's preliminary injunction, enjoining the promotion of "anyone not in plaintiffs' class" and restraining all "written exams in conjunction with promotions." Although an attorney who claimed to speak for the Union appeared and filed a motion to intervene on behalf of 17 white captains, none of the applicants sought to enter into the case at that time. In addition, the Court's Order of December 5, 1973, which was a matter of public record and was widely reported by the news media in the area, contained several sections dealing with future hiring and promotions in the Department. If the applicants were truly disturbed by the prospect of a "quota promotional remedy," they might have sought intervention at that time. Instead, the applicants have slept on whatever rights to intervene they may have had and now, dissatisfied with the settlement in the case, seek to set it aside. Cf. Basle Theatres, Inc. v. Warner Bros. Pictures Distributing Corp., 24 F.R.D. 476, 477 (W.D.Pa.1959).

Furthermore, to permit the applicants to reopen this case would result in unfair delays and consequences to the parties who have relied on the settlement agreement and the negotiations which produced it. The plaintiffs have already waited almost a year and a half since commencing this suit to vindicate their rights. At all times, the parties have bargained in good faith in the belief that an amicable settlement of a potentially divisive lawsuit was in process. Moreover, during the pendency of this lawsuit, and with the acquiescence of the plaintiffs, recruitment and hiring programs were established, promotions have been made, substitute firemen have been assigned, a schedule for the development of properly validated promotional exams was reached, and procedures for administering promotional examinations in the interim were agreed on and implemented. This complex web of acts in reliance upon the settlement negotiations would have to be unwoven if the case were reopened, and further delay in meeting the City's need for the appointment of new fire department officers would necessarily ensue.

Finally, the Court denies the motion to intervene on the ground that the applicants' rights were adequately represented by the existing parties and the intervenors. As stated hereinbefore, the final decree was agreed upon only after the most intensive negotiations, with all aspects of hiring and promotions within the Department being carefully weighed and reviewed, by officials of the City, the Civil Service Commission and the Department as well as by the 17 white captains who were permitted to intervene. The Court is satisfied that, under the circumstances of this

case, no good reason has been shown to allow intervention; the rights of every fireman within the Department have been fully considered and protected. Cf. Afro American Patrolmens League v. Duck, 503 F.2d 294, 298 (6 Cir. 1974); United States v. Carroll County Board of Education, 427 F.2d 141, 142 (5 Cir. 1970).

Accordingly, the applicant's motion to intervene and all related motions are denied.